# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**

**July 1, 2024**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**ROBIN SUMMERHILL,**
**Petitioner Below, Petitioner**

**v.) No. 23-ICA-494**      (Fam. Ct. Jefferson Cnty. No. FC-19-2019-D-315)

**GENE SUMMERHILL, JR.,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Robin Summerhill appeals the Family Court of Jefferson County's October 12, 2023, Final Order Modifying Spousal Support that reduced her spousal support from $2,500.00 per month to $1,000.00 per month. Respondent Gene Summerhill, Jr., filed a response in support of the family court's order.[1] Ms. Summerhill filed a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is error in the family court's decision but no substantial question of law. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure. For the reasons set forth below, the family court's decision is vacated, and this case is remanded for further proceedings consistent with this decision.

The parties were married for eighteen years and divorced by final divorce order on December 10, 2019. Two children were born of the marriage. Ms. Summerhill was a stay-at-home parent during most of the marriage. She re-entered the workforce around 2014. At the time of the divorce, Ms. Summerhill's annual income was approximately $27,000.00 and Mr. Summerhill's annual income was approximately $150,000.00. Under the terms of the divorce agreement, Ms. Summerhill was given primary custody of the parties' youngest child, born in November 2003.[2] Mr. Summerhill was ordered to pay child support to Ms. Summerhill in the amount of $930.00 per month.[3] Ms. Summerhill was additionally

---

[1] Robin Summerhill is represented by Kirk H. Bottner, Esq. Gene Summerhill, Jr. is represented by Frank M. Aliveto, Esq.

[2] The eldest child had become an adult by the time of the divorce.

[3] The youngest child is now an adult, and thus, no child support obligation is currently in effect.

awarded permanent spousal support in the amount of $2,500.00 per month pursuant to the parties' agreement. The final divorce order stated that spousal support was to "continue each and every month thereafter until modified by [o]rder of [the family court], the death of either party, or the remarriage of [Ms. Summerhill], whichever event shall first occur." The family court found the parties' agreement to be "fair and equitable."

On April 4, 2023, Mr. Summerhill filed a motion to modify spousal support that requested the family court terminate his $2,500.00 monthly spousal support obligation. In support of his motion, Mr. Summerhill asserted that "the parties' financial circumstances ha[d] materially changed."

On April 12, 2023, Ms. Summerhill replied to Mr. Summerhill's motion and filed a counter petition to modify spousal support, in which she requested the family court increase her spousal support due to Mr. Summerhill's salary increase, which she alleged constituted a substantial change of circumstances. Specifically, Ms. Summerhill asserted that while her salary had remained essentially the same since the entry of the final divorce order, Mr. Summerhill's annual income had increased by $30,000.00.

On September 14, 2023, the family court held a final hearing on both parties' motions to modify spousal support, allowing Mr. Summerhill to proceed with his motion first. Mr. Summerhill testified that he was asking the family court to terminate his spousal support obligation due to Ms. Summerhill's cohabitation with her boyfriend, Mr. Wingard, and her increased spending habits. The parties' daughter was called to testify for the purpose of giving her opinion regarding Ms. Summerhill's living arrangement with Mr. Wingard. The parties' daughter testified that she assumed that Mr. Wingard lived with Ms. Summerhill; she stated that she visited Ms. Summerhill approximately eight times in eleven months on different weekends and school breaks, during which Mr. Wingard was there every time she visited. The daughter also testified that although Ms. Summerhill told her that Mr. Wingard was not living there, she did not believe Ms. Summerhill because Mr. Wingard's work laptop was there, his shoes were at the door, his clothes were in the laundry, he had a large suitcase and a carry-on suitcase there, and she saw beer in the refrigerator.

The family court also heard testimony from Mr. Wingard, whom had been seeing Ms. Summerhill for sixteen months, for the purpose of showing their relationship was a substantial change in circumstances because it amounted to a de facto marriage. Mr. Wingard testified that he was from Pennsylvania, met Ms. Summerhill in May 2022, started spending more time in West Virginia in October 2022, and moved into his mother's Pennsylvania home in the summer of 2022 to help care for his father, who had cancer, but unfortunately passed away in April 2023. Testimony revealed that Mr. Wingard's mother was diagnosed with cancer in July 2023, started chemotherapy shortly thereafter, and there

was no one else to assist in taking care of his mother.[4] Also, although disputed, documentation revealed that Mr. Wingard had made many Facebook posts stating that he was living in West Virginia.[5] Mr. Wingard testified that when he and Ms. Summerhill vacationed, they split the cost; she usually paid for the overnight accommodations and dinners while he paid for gas, groceries, or anything else to help even the cost. Mr. Wingard additionally testified that although he spent a substantial amount of time at Ms. Summerhill's home, he did not reside with her and was not a resident of West Virginia. He specifically testified that he usually spent about "seven or so days" with Ms. Summerhill, did not pay Ms. Summerhill rent, did not help pay for her utilities, had never made improvements to her home, had a Pennsylvania driver's license, was registered to vote in Pennsylvania, had no bank accounts in West Virginia, did not have a joint bank account with Ms. Summerhill, did not own any real estate or personal property with Ms. Summerhill, did not have any credit cards with Ms. Summerhill, had not moved his belongings into Ms. Summerhill's home (other than the clothes and computer he packed for visits), usually bought food when he stayed with Ms. Summerhill, and had not made Ms. Summerhill a beneficiary to his will or any type of policies.

Most of the testimony and documentation presented during the family court's final hearing focused on Ms. Summerhill's relationship with Mr. Wingard and her spending habits since their relationship began. Testimony revealed that prior to their divorce, the parties saved money, infrequently dined out, and only vacationed in Myrtle Beach, Florida, and Pennsylvania. Specifically, Mr. Summerhill testified that although it was his choice to save for retirement and Ms. Summerhill's choice to enjoy life in the present, after seeing Ms. Summerhill's bank and credit card statements, she was living a better life than he was. The record revealed that since Ms. Summerhill met Mr. Wingard, the couple had vacationed in Washington D.C., South Carolina, and Florida. Mr. Summerhill testified that he no longer saved money, rarely vacationed, rarely ate out but frequently ordered GrubHub for his daughter "because she likes to order in a lot," and that due to the home renovations for his daughter moving in with him, he was "in the hole every month" and therefore felt that his support obligation was funding Mr. Wingard's lifestyle. However, Mr. Summerhill testified that he had no direct evidence that any of his support was funding Mr. Wingard's lifestyle or that Mr. Wingard was contributing financially to Ms.

---

[4] This testimony was elicited to indicate that Mr. Wingard had commitments in Pennsylvania and was thus, not cohabitating in West Virginia with Ms. Summerhill as alleged.

[5] When questioned about his Facebook posts, Mr. Wingard testified that he lied in the posts because after being divorced for almost four years, he finally met someone and got caught up in the moment of being happy in West Virginia with Ms. Summerhill.

Summerhill's household.[6] Mr. Summerhill agreed that the financial documentation did not appear to show that Mr. Wingard was sharing household expenses with Ms. Summerhill, and the only deposits into her account from a third party were from her parents.

On October 12, 2023, the family court entered a Final Order Modifying Spousal Support, where it reduced Ms. Summerhill's spousal support award from $2,500.00 to $1,000.00 per month and further ordered that the support cease when Ms. Summerhill turned sixty-two years old. The court found that Mr. Summerhill had met his burden, and a substantial change in circumstances had occurred due to Ms. Summerhill's relationship with Mr. Wingard, her spending habits, her savings, and Mr. Summerhill's debt.[7]

The family court further found that Mr. Summerhill did not allege a de facto marriage and thus made "no finding regarding de facto marriage." Additionally, the family court found that Ms. Summerhill's financial needs were met by her own employment and living arrangement, and that her support was being used to fund her social life, travel, and romantic endeavors with Mr. Wingard. It is from this order that Ms. Summerhill now appeals.

When reviewing the order of a family court, we apply the following standard of review:

> When a final order of a family court is appealed to the Intermediate Court of
> Appeals of West Virginia, the Intermediate Court of Appeals shall review

---

[6] Mr. Wingard testified that he was employed by the federal government in the Department of the Navy.

[7] Specifically, the family court made the following findings in support of its determination of a substantial change in circumstances: Mr. Wingard cohabitated with Ms. Summerhill; Ms. Summerhill "is either financially supporting Mr. Wingard . . . or that Mr. Wingard is contributing to [Ms. Summerhill's] household. Either way, it is apparent to the Court that [Mr. Summerhill's] spousal support obligation is likely being used to support Mr. Wingard"; Ms. Summerhill travelled and vacationed frequently; Ms. Summerhill paid off her significant credit card expenditures monthly; Ms. Summerhill had saved money since the divorce while Mr. Summerhill has accrued debt and was upside down in his budget; Ms. Summerhill's lifestyle and economic situation had improved since the parties' divorce while Mr. Summerhill's lifestyle was decidedly worse; Mr. Summerhill's largest monthly expenditure was his retirement savings, which he did during the parties' marriage; although Mr. Summerhill's salary had increased, "he continues to incur debt, travels infrequently, rarely eats out, and is not living at a standard consistent with when the parties were married"; and Ms. Summerhill's lifestyle, savings, and travels "allows for her to live better than that which the parties' were accustomed to during their marriage."

4

the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, No. 22-918, 2024 WL 2966177, __ W. Va. __, __ S.E.2d __ (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court orders).

On appeal, Ms. Summerhill asserts numerous assignments of error. She first argues that the family court erroneously found that a substantial change in *her* circumstances had occurred to warrant a modification reducing her monthly spousal support. In support of her argument, Ms. Summerhill contends that the family court abused its discretion when it found that "pursuant to West Virginia Code § 48-6-301(b)(17) [2018], the evidence has demonstrated circumstances sufficient to warrant a modification of spousal support."[8] She asserts that the only change in circumstances was Mr. Summerhill's $30,000 salary increase, which would justify granting her petition for an increase in spousal support rather than a decrease; however, she argues that the family court erroneously failed to address her petition in its order. Ms. Summerhill argues that the family court incorrectly justified reducing her support because of her alleged cohabitation with Mr. Wingard. Although Ms. Summerhill's argument is somewhat misplaced, we find merit in her argument, nonetheless.

This Court has previously held the following:

A lower court's analysis of a petition for modification of spousal support is two-fold. First, a substantial change of circumstances *must* be established. *See, e.g.,* Syl. Pt. 3, *Campbell v. Campbell*, 243 W. Va. 71, 842 S.E.2d 440 (2020) (citing Syl. Pt. 3, *Goff v. Goff*, 177 W. Va. 742, 356 S.E.2d 496 (1987)) (holding that party seeking modification has burden of showing substantial change of circumstances). Once a substantial change of circumstances has been established, the specific list of factors under West Virginia Code § 48-6-301(b) must be considered by the family court.

*Jackson v. Jackson*, No. 23-ICA-162, 2024 WL 140330, at *2 (W. Va. Ct. App. Jan. 12, 2024) (memorandum decision). We additionally stated that "[t]o modify spousal support based on an ex-spouse cohabiting with another person, the family court must make

---

[8] West Virginia Code § 48-6-301 (2018) lists spousal support factors that the family court is required to consider in determining the amount of spousal support to be awarded. Subsection (b)(17) of the code requires the court to consider the financial need of each party, and while this is a factor to consider *after* a change in circumstances is found, there is no caselaw to support this sole factor's consideration as being the determinant that a substantial change in circumstances has occurred.

'specific written findings by the court that . . . a de facto marriage has existed between the spousal support payee and another person.'" *Id.* at \*3 (citing W. Va. Code § 48-5-707(a)(1) (2001). Thus, when a de facto marriage is found to exist, a substantial change of circumstances has been established.

Here, as the basis for his request to terminate spousal support, Mr. Summerhill's petition for modification of support stated that "the parties' financial circumstances have materially changed" since the divorce. However, evidence adduced from the final hearing clearly indicated that Mr. Summerhill was trying to prove that a de facto marriage existed between Ms. Summerhill and Mr. Wingard due to the nature of their relationship. Mr. Summerhill elicited answers from witnesses regarding the details of Ms. Summerhill's relationship with Mr. Wingard, whether they lived together, and whether they shared expenses. Importantly, Mr. Summerhill's attorney informed the family court on the record that he called Mr. Wingard to testify because "I believe it is a de facto marriage. I believe it is a significant change in circumstances when you move another adult into your home." Mr. Summerhill's attorney additionally stated that the purpose of the parties' daughter's testimony would be to testify as to where Mr. Wingard lived. The parties' daughter testified that she talked to Mr. Summerhill about her testimony and was told that the issue was whether Mr. Wingard cohabitated with Ms. Summerhill. Mr. Summerhill acknowledged that he had no evidence to support his assertion that Mr. Wingard was contributing to Ms. Summerhill's living expenses but stated that Ms. Summerhill "has a live-in person that is living there. . . when someone is living there, they pay for the shared household expenses."

Our Supreme Court of Appeals has expressly held,

> [W]here the payor of spousal support seeks to have his or her support obligation reduced or terminated based upon the existence of a de facto marriage between the recipient of the spousal support and another, "the burden is on the payor to prove by a preponderance of the evidence that a de facto marriage exists."

*Wachter v. Wachter*, 216 W. Va. 489, 497, 607 S.E.2d 818, 826 (2004) (citing W. Va. Code § 48-5-707(a)(3)). In *Wachter*, the Court analyzed how a de facto marriage should be determined when a payee ex-spouse is cohabitating with another person.[9]

Although it is apparent that the family court based much of its decision on Ms. Summerhill's relationship with Mr. Wingard, the court specifically stated that it declined to make a finding regarding whether a de facto marriage existed because Mr. Summerhill

---

[9] Once a de facto marriage is determined to exist, *Lucas v. Lucas*, 215 W. Va. 1, 592 S.E.2d 646 (2003) provides lower courts with guidance on how to determine whether and to what extent a spousal support obligation should be reduced.

"did not make [an] allegation of [a] de facto marriage." We conclude that the family court's finding that Mr. Summerhill did not allege a de facto marriage was clearly erroneous based on Mr. Summerhill's own testimony, evidence he elicited through witnesses' testimony, and his counsel's argument. Regardless, because Mr. Summerhill sought to have his support obligation terminated due to Ms. Summerhill's alleged cohabitation with Mr. Wingard, it was his burden to prove the existence of a de facto marriage.

Simply stated, when a payor ex-spouse is seeking to terminate or reduce his spousal support obligation due to the cohabitation of the payee ex-spouse with another person, the payor has the burden to prove by a preponderance of the evidence, and the family court must first find, that a substantial change in circumstances has occurred by the existence of a de facto marriage. *See Wachter*, 216 W. Va. at 497, 607 S.E.2d at 826; *see also Jackson*, No. 23-ICA-162, 2024 WL 140330, at *2–3. Only then does the family court have the discretion to modify the support by considering the statutory factors. *See Lucas v. Lucas*, 215 W. Va. 1, 6–7, 592 S.E.2d 646, 651–652 (2003).

Therefore, we conclude that the family court abused its discretion by failing to analyze whether a de facto marriage existed under West Virginia Code § 48-5-707. On remand, the family court is instructed to consider, make findings concerning, and enter an order that determines whether the relationship between Ms. Summerhill and Mr. Wingard amounted to that of a de facto marriage before it determines whether support should be reduced.[10] Because we conclude that the family court abused its discretion by reducing the spousal support without first making the requisite finding of the existence of a de facto marriage, we decline to address Ms. Summerhill's additional assignments of error.

Accordingly, based on the foregoing, we vacate the family court's October 12, 2023, order, and remand this case for the family court to enter an order consistent with this decision.

Vacated and Remanded with instructions.

---

[10] We note that Ms. Summerhill assigns error to the family court's failure to address her counter petition for an increase of spousal support due to Mr. Summerhill's salary increase in its order. The family court, by granting Mr. Summerhill's petition, *did* essentially consider Ms. Summerhill's petition. However, on remand, if the family court arrives at a different conclusion regarding Mr. Summerhill's petition, the court's order shall address and analyze Ms. Summerhill's petition for an increase of support.

**ISSUED:** July 1, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear